UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA ) | Crim. No. 07-609 |
| ) | |
| v.                          ) | 18 U.S.C. § 371 |
| ) | |
| ROGER MICHAEL YOUNG   ) | |

## INFORMATION

The defendant having waived in open court prosecution by indictment, the United States Department of Justice charges:

## BACKGROUND

At all times relevant to this Information:

**RECEIVED**
JUL 2 5 2007
AT 8:30 _____ M
WILLIAM T. WALSH
CLERK

### ITXC Corporation

1. ITXC Corporation ("ITXC") was a publicly traded corporation with its principal office in Princeton, New Jersey. ITXC was a provider of global telecommunications services, primarily Voice Over Internet Protocol ("VOIP") services, a technology that allows individuals to make telephone calls using a broadband internet connection instead of a telephone land line.

2. ITXC had a class of securities registered pursuant to Section 12(g) of the Securities Exchange Act of 1934 (15 U.S.C. § 78*l*) and was required to file reports with the United States Securities & Exchange Commission under Section 13 of the Securities Exchange Act (15 U.S.C. § 78*m*). Thus, ITXC was an issuer as that term is used in the Foreign Corrupt Practices Act (15 U.S.C. § 78dd-1, *et seq.*).

3. In or about May 2004, ITXC merged with Teleglobe Corporation ("Teleglobe"), an international telecommunications carrier with its principal office in Montreal,

Canada.

## The Defendant

4. Defendant **ROGER MICHAEL YOUNG,** a resident of Maryland, was employed by ITXC as a Managing Director in the Sales Department from in or about 1999 to in or about May 2004. Defendant **YOUNG** was based in London and was responsible for the Middle East and Africa region. Defendant **YOUNG**'s duties included overseeing ITXC's sales force in the Middle East and Africa, which sales force was responsible for obtaining and negotiating contracts with foreign telecommunications companies on ITXC's behalf. Defendant **YOUNG** reported directly to ITXC's Executive Vice President of Global Sales.

5. Defendant **ROGER MICHAEL YOUNG** was a United States citizen and, therefore, a "domestic concern" as that term is defined in the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-2(h)(1)(A), as well as an employee of an issuer, pursuant to the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-1(a).

## The Co-Conspirators

6. Co-conspirator No. 1, a resident of New Jersey and a United States citizen, is named as a co-conspirator, but not as a defendant herein. Co-conspirator No. 1 was ITXC's founder, Chairman of the Board, Chief Executive Officer and President.

7. Co-conspirator No. 2, a resident of New Jersey and a United States citizen, is named as a co-conspirator, but not as a defendant herein. Co-conspirator No. 2 was ITXC's General Counsel.

8. Co-conspirator No. 3, a resident of New Jersey and a United States citizen, is named as a co-conspirator but not as a defendant herein. Co-conspirator No. 3 was ITXC's

Executive Vice President of Global Sales. Defendant **ROGER MICHAEL YOUNG** reported directly to co-conspirator No. 3.

9. Co-conspirator No. 4, a resident of New Jersey and a United States citizen, is named as a co-conspirator but not as a defendant herein. Co-conspirator No. 4 was employed as an in-house attorney by ITXC.

10. Co-conspirator No. 6, a citizen of South Africa, is named as a co-conspirator but not as a defendant herein. Co-conspirator No. 6 was ITXC's Regional Sales Manager for South Africa.

11. Yaw Osei Amoako, a resident of New Jersey and a United States citizen, is named as a co-conspirator but not as a defendant herein. Amoako was ITXC's Regional Manager for Africa and reported directly to Defendant **ROGER MICHAEL YOUNG**.

12. As United States citizens, co-conspirators No. 1, 2, 3, 4, and Yaw Osei Amoako were "domestic concerns" as that term is defined in the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-2(h)(1)(A), as well as officers and/or employees of an issuer, pursuant to the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-1(a). Co-conspirator No. 6 was also an employee of an issuer pursuant to 15 U.S.C. § 78dd-1(a).

## ITXC's Contracts

13. ITXC employed third party agents as sales agents or representatives in many African countries to obtain and retain business with its customers because it did not have employees based in Africa. Because ITXC had experienced difficulties obtaining contracts in Africa, defendant **ROGER MICHAEL YOUNG** and his co-conspirators hired employees of foreign-owned telecommunications companies to act as ITXC's agents.

3

## NITEL

14. NITEL was the largest telecommunications carrier in Nigeria and was wholly-owned by, and an instrumentality of, the Nigerian government. On or about October 25, 2002, ITXC and NITEL executed a VOIP Network Services Agreement (the "NITEL Carrier Agreement"), in which ITXC and NITEL agreed to provide and purchase internet telephone and telecommunications services from each other.

15. On or about November 13, 2002, ITXC entered into a Sales Representative Agreement with Standard Digital International Ltd. (the "Standard Digital Agency Agreement"). NITEL's General Director of International Relations, a member of the committee that reviewed the bids of the companies competing for NITEL contracts (the "NITEL Official"), signed the Standard Digital Agency Agreement, under his own name, as Standard Digital's "CEO." As an official of a Nigerian government instrumentality, the NITEL Official was a "foreign official" as that term is defined in the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-1(f)(1)(A). The Standard Digital Agency Agreement provided that in return for securing service agreements with service providers, ITXC would pay Standard Digital a retainer fee of $10,000 and a commission of 12 percent of ITXC's profits from those service agreements. Between November 2002 and May 2004, ITXC wire transferred approximately $166,541.31 from its bank account in New Jersey to Standard Digital's bank account in Nigeria.

## Rwandatel

16. Rwandatel was a telecommunications company wholly-owned and operated by, and an instrumentality of, the Rwandan government. ITXC entered into a Network Services Agreement (the "Rwandatel Carrier Agreement") with Rwandatel, effective as of February 28,

2002. In the Rwandatel Carrier Agreement, ITXC and Rwandatel agreed to provide and purchase internet telephone and telecommunications services from each other. The Rwandatel Carrier Agreement was signed by an employee of Rwandatel (the "Rwandatel Official"), under his own name.

17. While negotiating the Rwandatel Carrier Agreement, ITXC offered to make the Rwandatel Official ITXC's sales agent and pay him a commission based on the amount of traffic that ITXC received from the contract in exchange for the Rwandatel Official assisting ITXC in obtaining the contract with Rwandatel. As an official of a Rwandan government instrumentality, the Rwandatel Official was a "foreign official" as that term is defined in the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-1(f)(1)(A).

18. On or about July 2, 2002, ITXC entered into a Sales Representative Agreement with the Rwandatel Official (the "Rwandatel Official Agency Agreement"), who signed under his own name. The Rwandatel Official Agency Agreement provided that ITXC would pay the Rwandatel Official a commission of one cent per minute for certain traffic to Uganda, Burundi, and Rwanda terminated through Rwandatel. In or about September 2002, pursuant to the Rwandatel Official Agency Agreement, ITXC wire transferred approximately $26,155.11 from its bank account in New Jersey to the Rwandatel Official's bank account in Rwanda.

### Sonatel

19. La Societe Nationale des Telecommunications du Senegal ("Sonatel") was a telecommunications company located in Senegal. The Senegalese government owned approximately 25% of Sonatel and France Telecom owned approximately 42% of Sonatel. On or

about February 14, 2001, ITXC executed a Service Network Contract with Sonatel (the "Sonatel Carrier Agreement"), in which ITXC and Sonatel agreed to provide and purchase internet telephone and telecommunications services from each other. During the negotiations, a manager in Sonatel's International Action Department (the "Sonatel Employee"), was ITXC's primary contact.

20. While negotiating the Sonatel Carrier Agreement, ITXC offered to make the Sonatel Employee ITXC's sales agent and pay him commissions based on the revenues ITXC earned from the contract in exchange for the Sonatel Employee's assistance in obtaining a contract with Sonatel.

21. On or about March 15, 2001, ITXC entered into a Non-Exclusive Regional Agency Agreement with the Sonatel Employee (the "Sonatel Employee Agency Agreement"), which provided that ITXC would pay the Sonatel Employee a commission based on the revenue that ITXC earned from the Sonatel contract. Between March 2001 and October 2003, pursuant to the Sonatel Employee Agency Agreement, ITXC wire transferred approximately $74,772.06 from its bank account in New Jersey to the Sonatel Employee's bank account in France.

## Ghana Telecom

22. Ghana Telecom was a telecommunications company located in Ghana. The government of Ghana owned 70% of Ghana Telecom and, thus, Ghana Telecom was an instrumentality of the Ghanaian government. On or about March 2, 2001, ITXC signed a Network Agreement with Ghana Telecom, effective as of February 28, 2001, in which ITXC and Ghana Telecom agreed to provide and purchase internet and telecommunications services from each other.

23. In December 2002, Ghana Telecom disconnected its bandwidth link to ITXC due to a cost dispute. During ITXC's negotiations with Ghana Telecom over the cost dispute, ITXC offered to retain a General Manager in Ghana Telecom's International Department (the "Ghana Telecom Official"), as ITXC's sales agent and pay the Ghana Telecom Official commissions in exchange for his assistance in settling the dispute. As an official of a Ghanaian government instrumentality, the Ghana Telecom Official was a "foreign official" as that term is defined in the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-1(f)(1)(A).

### Sotelma

24. La Societe des Telecommunications du Mali ("Sotelma"), a telecommunications company located in Mali, was wholly-owned and operated by, and an instrumentality of, the government of Mali. In 2002, ITXC negotiated with Sotelma for a carrier contract. During the negotiations, ITXC offered to hire Sotelma's Director General (the "Sotelma Official"), as ITXC's sales agent and pay the Sotelma Official commissions based on the traffic the contract generated in exchange for the Sotelma Official's assistance in obtaining a contract with Sotelma. As an official of a Mali government instrumentality, the Sotelma Official was a "foreign official" as that term is defined in the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-1(f)(1)(A).

### ITXC's Merger with Teleglobe

25. In or about August 2003, ITXC began preliminary merger discussions with Teleglobe. In or about October 2003, the attorneys representing Teleglobe in the merger asked ITXC to verify, as part of the pending merger, that various factual statements regarding ITXC's business were true. One such factual statement was:

7

> SECTION 4.22 *Certain Business Practices.* To the Knowledge of Company, none of Company, any Company Subsidiary, nor any of their respective directors, officers, agents or employees (in their capacities as such) has (i) used any funds for unlawful contributions, gifts, entertainment or other unlawful expenses relating to political activity, (ii) made any unlawful payment to foreign or domestic government officials or employees or to foreign or domestic political parties or campaigns or violated any provision of the Foreign Corrupt Practices Act of 1977, as amended, or (iii) made any other unlawful payments, gift or contribution.

26. On or about October 27, 2003, an ITXC in-house attorney asked a senior management official in the ITXC Sales Department to provide a list of ITXC's agents who also worked for the telecommunications companies with whom ITXC had carrier agreements. On or about October 27, 2003, this official responded by emailing the following information to the ITXC in-house attorney:

> Senegal - [Sonatel Employee] works for SONATEL and that is the name on the agreement
> Nigeria - [Nitel Official] works for NITEL and the name on the agreement is Standard Digital
> Kenya - [Employee name] works for Adwest and the name on the agreement is Adwest
> Ghana - [Ghana Telecom Official] works for Ghana Telecom and the name that will appear is not known
> Angola - [Angola employee] works for Angola Telecom and the name that will appear is not known

27. On or about October 30, 2003, ITXC's General Counsel responded by email to Teleglobe's attorneys' request for, among other things, verification that ITXC had not made any unlawful payments to foreign or domestic government officials or any other unlawful payments. ITXC's General Counsel failed to disclose in this response any of the payments that ITXC made to sales agents while the agents were employed by foreign-owned companies. ITXC made no such disclosure in any subsequent draft or in the final disclosure schedule. The merger

agreement was finalized on or about November 3, 2003.

## THE CONSPIRACY

28. From in or about September 1999 through in or about October 2004, in the District of New Jersey, and elsewhere, defendant

### ROGER MICHAEL YOUNG

did knowingly and willfully conspire and agree with co-conspirators Nos. 1, 2, 3, 4, 6, Yaw Osei Amoako, and others to commit the following offenses against the United States:

(a) to make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to foreign officials for purposes of: (i) influencing acts and decisions of such foreign officials in their official capacities; (ii) inducing such foreign officials to do and omit to do acts in violation of the lawful duties of such officials; (iii) securing an improper advantage; and (iv) inducing such foreign officials to use their influence with foreign governments and instrumentalities thereof to affect and influence acts and decisions of such governments and instrumentalities in order to assist ITXC in obtaining and retaining business for and with, and directing business to, ITXC, contrary to Title 15 United States Code, Sections 78dd-1(a) & (g); and

(b) to travel and cause travel in interstate and foreign commerce and to use the mails and facilities in interstate and foreign commerce with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on, of commercial bribery contrary to Section 2C:21-10 of the New Jersey Code; and thereafter to

perform acts to promote, manage, establish, and carry on, and to facilitate the promotion, management, establishment and carrying on of commercial bribery, contrary to Title 18, United States Code, Section 1952(a)(3).

### Object of the Conspiracy

29. The primary object of the conspiracy was to pay money in the form of "commissions" to employees of foreign-owned telecommunications companies in order to assist in obtaining and retaining business for ITXC.

### Means and Methods of the Conspiracy

30. The means and methods by which defendant **ROGER MICHAEL YOUNG** and his co-conspirators accomplished the object of the conspiracy, included, but were not limited to, the following:

a. It was part of the conspiracy that defendant **YOUNG** and his co-conspirators offered to pay and did pay money to employees of foreign-owned telecommunications companies in exchange for the employees' assistance in obtaining and retaining carrier contracts with the companies for which the employees worked.

b. It was a further part of the conspiracy that when disputes arose regarding the execution of the carrier contracts, defendant **YOUNG** and his co-conspirators offered to pay and did pay money to employees of foreign-owned companies in exchange for the employees' assistance in resolving the disputes and maintaining ITXC's business with the companies.

c. It was a further part of the conspiracy that defendant **YOUNG**, his co-conspirators, and the employees ITXC hired as agents concealed from the foreign-owned companies the fact that ITXC had hired and made payments to the employees.

10

d. It was a further part of the conspiracy that between 2001 and 2004, defendant **YOUNG** and his co-conspirators caused approximately $267,468.48 of ITXC's funds to be wired from ITXC's bank account in New Jersey to pay the employees of the foreign-owned companies in exchange for their assistance in obtaining and retaining business for ITXC.

### Overt Acts

31. In furtherance of the conspiracy and to accomplish its unlawful objects, defendant **ROGER MICHAEL YOUNG** and his co-conspirators committed and caused the commission of the following overt acts, among others, in the District of New Jersey and elsewhere:

### NITEL

a. On or about October 10, 2002, prior to ITXC signing the NITEL Carrier Contract, Yaw Osei Amoako sent an email to co-conspirator No. 4 and others, in which Amoako stated in part, "I was able to get [co-conspirator No. 3's] counterpart at NITEL to chat with [co-conspirator No. 3] in my hotel room and he poured out what we have to do to get the deal through with [sic] getting him in trouble for favoring ITXC."

b. On or about October 11, 2002, Amoako sent defendant **YOUNG**, co-conspirators Nos. 2, 3, 4, and others an email in which Amoako encouraged his co-conspirators to accept the NITEL deal and also stated in part: "Prior to sending real traffic, NITEL is ready to sit down and give ITXC special rates. Do I trust them on this? Yes. The Agents are the negotiators but is [sic] afraid of other operators [sic] actions and political contacts with Minister, President, and Vice President."

c. On or about November 13, 2002, defendant **YOUNG** and his co-conspirators

11

caused ITXC to enter into the Standard Digital Agency Agreement, which agreement provided that ITXC would make commission payments to the NITEL Official based on the amount of traffic ITXC received from the NITEL Carrier Contract.

d. On or about December 23, 2003, defendant **YOUNG** and his co-conspirators caused ITXC to wire transfer approximately $150,000 from ITXC's bank account in New Jersey to Standard Digital's bank account in Nigeria, which payment represented the NITEL Official's commission for assistance in resolving a fee dispute between NITEL and ITXC.

### Rwandatel

e. On or about July 2, 2002, defendant **YOUNG** and his co-conspirators caused ITXC to enter into the Rwandatel Agency Agreement with the Rwandatel Official, which provided that ITXC would pay the Rwandatel Official commissions for traffic terminated through Rwandatel.

f. On or about September 11, 2002, defendant **YOUNG** and his co-conspirators caused ITXC to wire transfer approximately $26,155.11 from ITXC's bank account in New Jersey to the Rwandatel Official's bank account in Rwanda.

g. In or about December 2002, a dispute arose with the Managing Director at Rwandatel regarding the Rwandatel Official's failure to share with Rwandatel's Managing Director the money ITXC paid the Rwandatel Official. On or about December 4, 2002, in response to defendant **YOUNG**'s inquiry regarding whether ITXC could tell Rwandatel's Managing Director how much money ITXC paid his subordinate, co-conspirator No. 4 sent an email to defendant **YOUNG**, co-conspirator No. 2, and others in which co-conspirator No. 4 stated in part: "I have reviewed the agr't with [co-conspirator No. 2], and he and I concluded that

we can reveal the information, although in the ordinary case, we shouldn't (but this doesn't seem to be an ordinary case)."

      h. On or about December 6, 2002, while discussing how to handle the dispute, co-conspirator No. 6 sent an email to co-conspirators Nos. 2, 4, and defendant **YOUNG** in which co-conspirator No. 6 stated in part:

> I met the [Managing Director] of Rwandatel in Johannesburg and he told me that he is opposed to the current "agent" receiving commissions. He does not trust the current agent who is his subordinate. So he wants us to sign with an agent of his choice who will now receive all outstanding amounts plus future commission. The [Managing Director] will then cooperate with ITXC. We also agree that the current agent [the Rwandatel Official] must not be informed of the meeting and of the new arrangement. [The Rwandatel Official] will be restricted to engineering work and not be involved in rate and financial discussions.
>
> The way I see it, [the Rwandatel Official] cannot cause any trouble to ITXC as the [Managing Director] is in charge. He cannot sue because he would be arrested for receiving kickbacks.

      i. On or about January 24, 2003, co-conspirator No. 4 sent an email to defendant **YOUNG** and others in which he advocated that ITXC pay the Rwandatel Official the remaining commissions and also stated in part: "Obviously, we'll need to make good on any payments we've held back to date and any he's due through 3 months from the effective termination date. . . ."

### Sonatel

      j. On or about March 15, 2001, defendant **YOUNG** and his co-conspirators caused ITXC to enter into the Sonatel Employee Agency Agreement, which provided that ITXC would pay the Sonatel Employee commissions on the revenue that ITXC generated from its contract with Sonatel.

k. On or about September 13, 2002, following a dispute concerning the amount that ITXC owed Sonatel, defendant **YOUNG** sent an email to co-conspirators Nos. 1, 3, and others in which he stated in part: "[the Sonatel Employee] is the only one defending us in [the Sonatel monthly Board meetings] and he tells me [France Telecom] is becoming very suspicious. We need to get him out of the spot light asap."

l. On or about May 7, 2003, while co-conspirator No. 1 was preparing for a meeting with the Sonatel Employee, co-conspirator No. 3 sent an email to co-conspirator No. 1 in which he stated in part: "Sonatel is not an easy organization to deal with. France Telecom is gripping them pretty tight. [The Sonatel Employee] is not the force he used to be - but we still need him and he can still do good. Just be prepared not to get the most complete or direct answers to your questions."

m. On or about October 29, 2003, defendant **YOUNG** and his co-conspirators caused ITXC to wire transfer approximately $7,175.20 from ITXC's bank account in New Jersey to an account in France for the benefit of the Sonatel Employee.

### Sotelma

n. On or about November 21, 2002, Amoako sent an email to co-conspirators Nos. 2, 3, and 4 stating, in part, that: "I have been working on Sotelma, Mali Telecom, for months and eventually I am positive that I will get them through. Sotelma is looking for Termination, Origination, Domestication, and Prepaid. In this order, we are starting with Term and follow up with other services. I have the Director General in the deal as an agent who is been [sic] fronted by his lieutenants."

### ITXC Merger with Teleglobe

o. On or about October 30, 2003, co-conspirator No. 2 sent an email to Teleglobe's outside attorney and attached a draft response to Teleglobe's request that ITXC verify that it had not made any unlawful payments. In his response, co-conspirator No. 2 failed to disclose any of the payments that ITXC made to sales agents while the agents were employed by foreign-owned telecommunications companies.

All in violation of Title 18, United States Code, Section 371.

CHRISTOPHER J. CHRISTIE
United States Attorney

STEVEN A. TYRRELL
Chief, Fraud Section
Criminal Division
U.S. Department of Justice

MARK F. MENDELSOHN
Deputy Chief, Fraud Section